**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:06-cv-462-RJC-DSC**

| | | |
|---|---|---|
| **DENNIS CROSBY et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER** |
| **CITY OF GASTONIA,** | ) | |
| a municipality existing under the | ) | |
| laws of the State of North Carolina, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment

(Doc. Nos. 72, 93, 95, 100, 101). For the following reasons, the Court **DENIES** the plaintiffs'

motion for summary judgment and **GRANTS** the defendant's motion for summary judgment.

**I. BACKGROUND**

This action concerns officers who dedicated their lives to a career of service to the City of

Gastonia. Each plaintiff devoted over fifteen years as an officer with the Gastonia Police

Department ("the Department"), risking life and limb daily to ensure the safety of the City's citizens,

and eventually retiring from the Department. For this service, they should be honored and thanked.

Whether the City of Gastonia is contractually or Constitutionally required to supplement their

pensions, is however, a different question. For the reasons stated below, the Court answers that

different question in the negative.

The Gastonia Policemen's Supplementary Pension Fund ("SPF" or "the Fund") was created

by the North Carolina General Assembly in 1955 to provide supplemental benefits to retired

members of the City of Gastonia Police Department. The SPF ran out of funds in 2005, and retired

officers who had previously vested in the SPF sued the City of Gastonia over the Fund's failure.

When the General Assembly created the Fund in 1955, it provided that once a full-time

member of the Gastonia Police Department had served for twenty years, if the officer then retired

and was at least fifty-five years old,  he would be eligible to receive benefits from the Fund.[1]  (Doc.

No. 72-2 at Sec. 2).  The original 1955 Act set forth that:

> Any full-time paid member of [the Department] who retires or is retired under the provisions of this Act shall receive monthly for the remainder of his life from the [Fund] an amount equal to two percent . . . for each five years of service, not to exceed fourteen per cent . . . of his average monthly salary for the three highest salaried years while employed by [the Department].

An Act to Establish a Supplemental Pension Fund for Policemen in the City of Gastonia, 1955 N.C.

Sess. Laws ch. 946, § 3.

The General Assembly amended the Fund legislation in 1957, 1959, 1965, 1983, and finally

in 2002.  In 1959, four years after the Fund was established, the General Assembly added language

to the Act that made benefits contingent upon funds being available.  Specifically, the 1959

amendment changed the language of the Act to state:

> Any full-time paid member of [the Department] who retires or is retired under the provisions of this Act shall receive monthly for the remainder of his life from the [Fund], so long as funds are available, an amount equal to two percent . . . for each five years of service, not to exceed fourteen per cent . . . of his average monthly salary for the three highest salaried years while employed by [the Department].

Act of April 15, 1959, H.B. 430, 1959 N.C. Sess. Laws ch. 301, § 2 (amending 1955 N.C. Sess.

Laws ch. 946, § 3, as rewritten by 1957 N.C. Sess. Laws ch. 112 § 2) (emphasis added).  This

contingency that funds would be paid "so long as funds [were] available" was retained throughout

---

[1] It also contained a different vesting rule for officers who became disabled after serving for fifteen years.

the evolution of the Act in its subsequent amendments, including the 2002 legislation that essentially ended the Fund.

The Act directed a Board of Trustees to administer the SPF. The Board was comprised of Gastonia's Chief of Police, the Commander of Operations of the Police Department,[2] and the City's Finance Officer.[3] The Board was charged under the Act with investing all money coming into the possession of the SPF and paying out money to qualifying retirees. Further, the Board was authorized to receive any grants or donations on behalf of the fund.

The SPF received funding from various sources. The initial Act made it lawful for the City to tax defendants convicted of offenses in the Municipal Court of the City of Gastonia up to one dollar to help fund the SPF. Such taxes were to be paid to the SPF's custodian, the Trustee position occupied by the Finance Officer. In April 1965, the Act was amended to allow the City to tax convicted defendants up to three dollars, rather than one dollar, in support of the SPF. In June 1965, the General Assembly amended the Act once again. The June 1965 amendments granted the City the "power and authority to decrease the court cost presently collected in every criminal case in the Gastonia Municipal Recorder's Court; provided, however, that out of every court cost collected in said court, at least three dollars . . . shall be paid . . . to the State Law Enforcement Officers' Benefit and Retirement Fund." 1965 N.C. Sess. Laws ch. 979, § 13. The June 1965 amendments also authorized the Gastonia City Council "to make such contributions from the [City's] General Fund . . . as they shall deem appropriate and from whatever sources they deem desirable." Id. § 11.

---

[2] Originally, this position was occupied by the Assistant Chief of Police.

[3] Originally, this position was occupied by the City Accountant.

Proceeds from the Department's vending machines also helped fund the SPF. In addition, until 1986, if an officer left the Department before retiring, the State refunded to the City all contributions the City had made to the State Law Enforcement Officers' Benefit and Retirement Fund for that officer. The City in turn donated this money to the SPF until the City stopped receiving the refunds because of a 1986 change in state law. The City did not make donations to the Fund again until 1995, when it began contributing $20,000 annually to it.

Various amendments to the Fund legislation envisioned officer salaries as an income source for the SPF. The 1959 amendment authorized the Board of Trustees to call an election at any time, at which three-fourths of the members of the Police Department could vote to contribute two percent of the gross salary of each member of the Department to the SPF. This amendment directed the City of Gastonia, upon such a vote, to deduct two percent from each officer's pay and remit it to the Board. The 1965 amendments lowered the required officer vote from three-fourths to a simple majority when deciding whether to contribute two percent of officers' salaries to the Fund. The 1965 amendments also empowered the City to deduct two percent of officers' gross salaries, without a vote of the officers, to help fund the SPF.

The City never exercised its option to unilaterally deduct two percent of officers' salaries in support of the SPF. In the 1990s, however, the Fund began experiencing financial difficulties, and police officers voted to contribute two percent of their salaries to keep the Fund operational. The City gave effect to the officers' vote and deducted two percent of officer salaries, submitting the money to the SPF's Board as Fund property. By 2002, however, the Fund was in such financial straights that the police officers voted to discontinue the 2% contributions, refund all active officers'

previous contributions, and allow the Fund to continue until its assets became depleted.[4]  Based on

this vote, Gastonia's City Council adopted a resolution requesting the General Assembly to enact

legislation giving effect to the officers' vote, and distributing all remaining assets to vested officers.

The General Assembly adopted legislation in October 2002 that discontinued funding from officer

salary contributions, which was at that time the SPF's main source of income.  The 2002 legislation

further refunded all past contributions of active officers, eliminating roughly half of the Fund's

assets.  This legislation did not adopt the City's request to distribute the remaining assets to vested

members.  Nonetheless, by the fall of 2005, the Fund's assets became depleted, and benefits ceased.

Plaintiffs assert claims for breach of contract and violation of the Contract Clause of the

United States Constitution when the City of Gastonia failed to pay Fund benefits to vested officers.

They further allege that the City breached a fiduciary duty to the plaintiffs by allowing the Fund to

fail and by not paying fund benefits.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

---

[4] In presenting the issue to officers prior to the referendum where the vote was cast, plaintiff Rodney
Parham, the Police Chief at the time and a Trustee of the Fund, wrote:

> There exists then, two alternatives.  One is to increase the amount of funding by
> increasing the deduction from officers' salaries.  The second is to discontinue the
> fund and return to each officer the amount of monies contributed into the Fund.
> Those officers who are retired, or who retire, before the effective date of the ending
> of the Fund, would receive their usual monthly payments until such time that the
> Fund became depleted - possibly sometime around the year 2007.

Doc. No. 93-14 at 1.

P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**III. DISCUSSION**

The plaintiffs claim that (1) the City breached a contract when it failed to pay them Fund benefits; (2) the City violated their constitutional rights under the Contract Clause; and (3) the City breached a fiduciary duty to the plaintiffs when it allowed the Fund to fail.

**A. The Contract Clause claim**

The Contract Clause states that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. To sustain a claim for violation of the Contract Clause, a plaintiff must prove (1) that the contract has been impaired; (2) that the state action has in fact operated as a substantial impairment of the contract; and (3) that the impairment is not a "legitimate exercise of the state's sovereign powers." Catawba Indian Tribe v. City of Rock Hill, 501 F.3d 368, 371 (4th Cir. 2007) (citations omitted). Inherent to this analysis is the existence of a valid and enforceable contract, without which no impairment could occur.

"A simple breach of contract by a governmental entity does not impair the obligation of the breached contract." Charles v. Baesler, 910 F.2d 1349, 1356 (6th Cir. 1990) (citing Hays v. Port of Seattle, 251 U.S. 233, 237-38 (1920)); see also Jackson Sawmill Co. v. United States, 580 F.2d 302, 311-12 (8th Cir. 1978) ("[A]n individual breach of contract . . . does not reach constitutional dimensions and create a cause of action based on the contracts clause."); E & E Hauling v. Forest Preserve Dist., 613 F.2d 675, 678 (7th Cir. 1980) ("Mere refusal to perform a contract by a state does not raise a constitutional issue."). Rather, "[t]he state, like any private party, must be able to breach contracts without 'turning every breach . . . into a violation of the federal Constitution.'" TM Park Ave. Assocs. v. Pataki, 214 F.3d 344, 348-49 (2d Cir. 2000) (citation omitted). Therefore, a distinction exists between the impairment of a contract and the mere breach of a contract. Where an impairment raises a constitutional question, a mere breach does not.

The line between mere breach and unconstitutional impairment is crossed where the state or local government action forecloses the possibility of damages or an equivalent remedy. See Hays, 251 U.S. at 237; Horwitz-Matthews, Inc. v. City of Chicago, 78 F.3d 1248, 1250-51 (7th Cir. 1996).

7

Thus, for example, where a state passes legislation that would prevent a local government from fulfilling its obligations under a contract, there is no available damages remedy, because the breaching local government is prevented by state law from performing. See E & E Hauling, 613 F.2d at 679. In such a case, a contract would be unconstitutionally impaired. On the other hand, where a city breaches a contract without a state legislative mandate as a defense, nothing generally prevents or excuses the city from performing its obligations, and thus the city will be liable for damages. See Horwitz-Matthews, 78 F.3d at 1251 ("Unless the form affects the promisee's remedy -- unless the city council has been delegated authority by the state to modify the law of contracts, which is state rather than municipal law -- there is no impairment of the obligation of the city's contracts."). As one court has stated, "the obligation created by a contract is an obligation to perform or pay damages for nonperformance, . . . and if the second alternative remains, then, since it is an alternative, the obligation created by the contract is not impaired." Id. at 1252 (citation omitted).

There is no impairment of contract in this case. The plaintiffs have not claimed that the City is precluded from liability for damages,[5] and no government action has foreclosed the possibility of a damages remedy. Nor have the plaintiffs alleged or proven that the City has in some way prevented the Trustees or vested officers from fulfilling their obligations under the contract. To the contrary, the plaintiffs have sought damages for breach of contract regarding the same governmental action they claim impaired the contract. In arguing their claims, the plaintiffs have used the term

---

[5] Rather, the plaintiffs themselves argue that the City could have sustained the SPF by providing more funding, but that the City discontinued funding because of "budget considerations." (Doc. No. 72 at 28). This argument by the plaintiffs tends to belie the notion that the City was foreclosed from fulfilling its purported obligation under the contract, namely to fund the SPF. The City has no complete defense to the alleged breach, as the state legislature did not prohibit the City from funding the SPF. Nothing in the Fund legislation, from its origin in 1955 to the most recent amendment in 2002, has prohibited the City from funding the SPF. Further, even if the state legislature had prevented the City from performing, the state would be in violation of the Contract Clause rather than the City.

impairment synonymously with the concept of breach, when there is an important distinction between the two that has jurisdictional implications. If the City is liable for breach of contract, then it will be required to pay damages for that breach. Thus the contract is not "impaired" in a constitutional sense.

The plaintiffs claim that this case is indistinguishable from a number of state-court cases holding that vested employees' rights had been impaired under the Contract Clause. See, e.g., Faulkenbury v. Teachers' and State Employees' Ret. Sys., 483 S.E.2d 422 (N.C. 1997); Bailey v. State, 500 S.E.2d 54 (N.C. 1998); Wiggs v. Edgecombe County, 643 S.E.2d 904 (N.C. 2007). While this Court is in no way bound by these state-court cases regarding a federal constitutional issue, they are factually similar enough to warrant consideration. However, none of the defendants in those cases challenged whether the contracts were impaired based on the notion that a damages remedy was available to the plaintiffs. Further, those courts had less incentive to raise the issue sua sponte, because unlike a federal court's jurisdiction, which rests on the determination, the state courts would have had jurisdiction regardless of whether a Contract Clause claim or state law breach of contract claim was in issue.[6] The only Fourth Circuit case that the plaintiffs cite did not reach the question, finding that the plaintiff had not vested in benefits at the time of the alleged impairment, and thus that no contract existed. See Kestler v. Bd. of Trustees, 43 F.3d 800, 804 (4th Cir. 1995).

---

[6] In the state-court cases with the state named as defendant, it is not clear that they were appropriately analyzed under the Contract Clause as opposed to as simple breach of contract cases. Because the State of North Carolina "waives sovereign immunity when it enters into a contract authorized by law," see Rifenburg Const., Inc. v. Brier Creek Associates Ltd. Pship, 586 S.E.2d 812, 818 n.1 (N.C. Ct. App. 2003) (citing Smith v. State, 222 S.E.2d 412 (N.C. 1976)), damages for breach would likely have been available to the vested employees. In the only state-court case involving a county as a defendant, the court looks to have conflated the notion of impairment with the notion of breach. See Wiggs, 643 S.E.2d 904.

During oral arguments on this motion, the plaintiffs' counsel tried to explain that this case presents an issue of impairment because the plaintiffs hold vested rights, and once benefits have accrued to vested officers, they become a property right that implicates the Constitution and the Contract Clause. Counsel for plaintiffs further argued that impairment is easy to find in this case, because Fund benefits were eliminated altogether. These arguments do not address the key issue for determination: whether the plaintiffs are left without a remedy for damages, or an equivalent remedy, in the face of a breach. Whether the plaintiffs were vested or non-vested, and whether benefits were eliminated altogether or only partially, are tangential matters. The inquiry is whether damages are available. Plaintiffs have neither claimed nor offered evidence that damages are unavailable for the alleged breach. Therefore, since there is no impairment of contractual obligations, this Court does not have subject matter jurisdiction over the Contract Clause claim, and the claim will be dismissed.

**B.  Whether to retain supplemental jurisdiction over the state law claims**

After dismissing all claims over which it has original jurisdiction, it is within the Court's broad discretion whether to retain supplemental jurisdiction of the remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (under § 1367(c), the district courts "enjoy wide latitude in determining whether or not to retain [supplemental] jurisdiction over state claims when all federal claims have been extinguished") (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). Declining supplemental jurisdiction where all federal claims have been dismissed is consistent with the general principle that federal

jurisdiction is limited. In certain cases, however, the equities weigh in favor of retaining supplemental jurisdiction despite all federal claims having been dismissed.

In determining whether to retain jurisdiction over the state law claims, the Court will consider "the convenience and fairness to the parties, existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan, 58 F.3d at 110. Neither comity concerns nor underlying issues of federal policy weigh heavily in favor of the Court's retention or dismissal of the state law claims. However, convenience and fairness to the parties, paired with strong considerations of judicial economy, militate in favor of retaining supplemental jurisdiction. This action was filed in the Superior Court of Gaston County and removed to this Court over three years ago. All the issues have been fully briefed, and the Court has heard oral arguments on cross summary judgment motions. In the interest of expediting resolution of this aging dispute, the Court will retain jurisdiction over the state law breach of contract and breach of fiduciary duty claims.

### C. The breach of fiduciary duty claim

The plaintiffs alleged in the complaint that the City breached a fiduciary duty, but they failed to brief or present evidence on the issue in moving for summary judgment. In responding to the City's motion for summary judgment, the plaintiffs merely argue that "[i]t would certainly seem obvious that if there is an unlawful and unconstitutional act by the City of Gastonia in terminating the [Fund], that such acts would constitute a breach of fiduciary duty to its employees." (Doc. No. 101 at 14). The Court does not evaluate the soundness of this legal position, especially considering that there is no unconstitutional act at issue.

The plaintiffs' failure to present evidence demonstrating a duty held by the City to fund the SPF defeats their motion for summary judgment on this issue. Further, the City argues that it has

not waived its governmental immunity for this tort claim and thus should be granted summary judgment as to this claim. "Acts of municipalities can be divided into two categories: (1) governmental functions, that is, discretionary, political, legislative, or those public in nature preformed for the public good; and (2) proprietary functions, that is, activities which are commercial or chiefly for the private advantage of the compact community." Sisk v. City of Greensboro, 645 S.E.2d 176, 719 (N.C. Ct. App. 2007) (citation omitted). "Under the doctrine of governmental immunity, a municipality is not liable for the torts of its officers and employees if the torts are committed while they are performing a governmental function . . . ," unless it has waived civil tort immunity by purchasing liability insurance. Willis v. Town of Beaufort, 544 S.E.2d 600, 603 (N.C. Ct. App. 2001) (citation omitted); see N.C. Gen. Stat. § 160A-485 (2008) ("[N]o city shall be deemed to have waived its tort immunity by any action other than the purchase of liability insurance."). "Immunity is waived only to the extent that the city or town is indemnified by the insurance contract from liability for the acts alleged." 544 S.E.2d at 604 (citation omitted).

Taken in the light most favorable to the plaintiffs, if the City had a duty to fund the SPF, then the act of funding the SPF would be a governmental function rather than a proprietary one. This is because such an action, purportedly required by state statute, would be more political, legislative, and performed for the public good, as opposed to commercial or proprietary in nature. See Evans v. Housing Authority, 602 S.E.2d 668, 671 (N.C. 2004) ("One of the tests that courts have employed to differentiate between governmental and proprietary functions is whether or not a fee is charged for the service. A fee suggests that an activity is proprietary."). The City has offered an affidavit showing it has no liability insurance for the plaintiffs' fiduciary duty claim. (Doc. No. 93-10 at ¶¶ 2-4). The plaintiffs have offered nothing to rebut the City's affidavit. Therefore, the Court finds that

the City has not waived tort immunity for the plaintiffs' fiduciary duty claim, and the City's motion

for summary judgment will be granted as to this claim.

### D. The breach of contract claim

#### 1. Whether the City was a party to the contract

Plaintiffs contend, among other arguments, that the City, by referring to the Fund in various

handbooks and promotional materials, such as the benefits portion of the Police Department's

website, made a contractual offer to the plaintiffs.[7]   Much of this evidence is unauthenticated

hearsay.  For instance, the plaintiffs offer a copy of a portion of the Gastonia City Code that details

Fund benefits but does not contain the language "so long as funds are available."  However, the

plaintiffs provide no evidence as to the effective year of the code they cite.  The Court notes that in

describing the SPF, this unauthenticated copy of the municipal Code only cites the 1957 state

legislative amendment to the original Act, when the Act did not yet contain the "so long as funds are

available" language.  Later versions of the Code, at least since 1991, refer to the most updated

amendments of the Act.  See An Act to Revise and Consolidate the Charter of the City of Gastonia,

H.B. 789, 1991 N.C. Sess. Laws ch. 557, § 1.

"It is well established that unsworn, unauthenticated documents cannot be considered on a

motion for summary judgment.  To be admissible at the summary judgment stage, documents must

be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)."  Orsi v.

Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993).  This type of evidence, if authenticated, might be an

admission by a party opponent, or subject to one of a number of hearsay exceptions.  However, the

---

[7] The plaintiffs also argue that the City made the decision that officers would not contribute to Social Security so that they could instead contribute to the SPF.  However, they provide no evidence in support of this contention, and it is unclear which of the plaintiffs' claims this fact would support.

Court cannot accept as evidence a purported copy of a few pages of an undated municipal Code, without any affidavit attached, as competent evidence for summary judgment purposes.

The plaintiffs' allegations of reliance on various purported City documents sounds more in promissory estoppel than true contract. These proffered documents look more like bare promises or descriptions of the legislation detailing the Fund, rather than contractual offers. However, the clear law in North Carolina prohibits the use of promissory estoppel in an offensive manner. See Pharmacy Servs., Inc. v. Beverly-Hanks & Assocs., Inc., 124 F. Supp. 2d 343, 347 (W.D.N.C. 2000) (citing Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc., 477 S.E.2d 262, 265 (N.C. Ct. App. 1996)); Dealers Supply Co. v. Cheil Indus., 348 F. Supp. 2d 579, 587 (M.D.N.C. 2004) (citing Home Elec. Co. v. Hall & Underdown Heating & A.C. Co., 358 S.E.2d 539, 542 (N.C. Ct. App.1987)). Thus the plaintiffs' claim sounding in promissory estoppel fails.

## 2. Whether the City breached the contract

Assuming arguendo that an enforceable contract existed between the plaintiffs and the City, the plaintiffs have failed to show that the City breached the contract. For purposes of analysis only, the Court will accept the plaintiffs' contention that the terms of the contract are the language of the Fund legislation. Since 1959, the Fund legislation has stated:

> Any full-time paid member of [the Department] who retires or is retired under the provisions of this Act shall receive monthly for the remainder of his life from the [Fund], so long as funds are available, an amount equal to two percent . . . for each five years of service, not to exceed fourteen per cent . . . of his average monthly salary for the three highest salaried years while employed by [the Department].

The plaintiffs argue that the language "so long as funds are available" is a phrase that applies only to non-vested officers, and that once officers vested in Fund benefits, they were entitled to them without limitation or contingency. The City contends that this language can only apply to vested

officers, and that it is an explicit limitation on the plaintiffs' rights under the contract.

The plaintiffs rely on two main cases in support of their position: Simpson v. North Carolina Local Gov't Employees' Ret. Sys., 363 S.E.2d 90 (N.C. Ct. App. 1987), and Faulkenbury, 483 S.E.2d 422. In Simpson, the state legislature changed an existing retirement fund statute, which resulted in certain previously vested members receiving a smaller retirement allowance. 363 S.E.2d at 92. The court noted that the plaintiffs "had a contractual right to rely on the terms of the retirement plan as these terms existed at the moment their retirement rights became vested," and it found that the state action impaired the contract. Id. at 94. Similarly, in Faulkenbury, the state had statutorily reserved the right "to modify or amend" the fund legislation at issue. 483 S.E.2d at 427. It later modified the legislation, and the modification reduced the benefits of officers who had previously vested. Id. The Faulkenbury court held that the state substantially impaired the contract when it modified the plan to reduce the benefits of vested employees. Id. at 428.

Simpson and Faulkenbury are both inapposite to the case at bar, at least on this issue. The breach in those two cases is very different from the alleged breach here. In both Simpson and Faulkenbury, the state passed legislation that adversely changed a fund's benefit structure after plaintiffs had vested, adversely affecting those plaintiffs' benefits payments. Here, on the other hand, the Fund's depletion was envisioned in the purported contract. The language "so long as funds are available" existed in the Fund legislation since 1959. Thus the change to the legislation adding this contingency language occurred before the plaintiffs ever vested in Fund benefits.[8] The plaintiffs, as long as they did not vest prior to 1959, accepted this contingency as a part of the contract.

---

[8] The plaintiffs have failed to put forward evidence that any single plaintiff vested in Fund benefits prior to 1959, and thus the Court does not address the issues from such a plaintiff's perspective.

The plaintiffs attempt to explain how the limitation only applies to non-vested officers and not to officers who have vested in Fund benefits. In support of this contention, they argue that the "plain meaning of 'so long as funds are available'" is that "once an officer was vested, those rights to his retirement were already earned, due and payable upon retirement." (Doc. No. 72 at 22). However, non-vested officers are not considered in the sentence stating benefits will be paid "so long as funds are available." The phrase "so long as funds are available" modifies the phrase "[a]ny full-time paid member of [the Department] who retires or is retired under the provisions of this Act shall receive monthly for the remainder of his life from the [Fund]." An officer who "retires or is retired under the provisions of this Act" is a vested officer. Therefore, the plain meaning of the statute is that vested officers will receive Fund benefits as long as funds are available.[9] In effect, officers who met the vesting requirements vested in benefits conditioned on the Fund having sufficient assets.

The plaintiffs argue that Section 9 of the original 1955 Act allowed the City to adopt a resolution abolishing the Fund, and that this Section was entirely repealed in 1959. From this fact, they argue that the state in 1959 took away any ability the City once had to end the fund. The plaintiffs fail to show how this change is relevant, however, since the City never affirmatively abolished the Fund. The legislature's 1959 repeal of Section 9 of the original Act does not change the meaning of the phrase "so long as funds are available," which was added in the same 1959 amendment that abolished Section 9. It would be very strange for the legislature to add language to a statute and make it ineffective at the same time. The plaintiffs are equating the City's former authority to affirmatively abolish the SPF with language that makes SPF benefits contingent upon

---

[9] As the City correctly points out, non-vested officers were never entitled to any benefits, and thus the contingency language as applied to them would be meaningless. The Court will not presume that the General Assembly specifically added this phrase so as to have it construed as meaningless.

16

the availability of funds. These are two very different items, and the repealing of the one does not negate the other.

The benefits in which the plaintiffs vested were benefits contingent upon funds being available to the SPF and its Trustees for disbursement. They City's failure to contribute enough assets to keep the SPF alive, while not in keeping with honoring its officers, was envisioned by the Fund legislation beginning in 1959. Therefore, the City did not breach the contract to which the plaintiffs allege it was a party.

## IV.  CONCLUSION

The Court empathizes with the plaintiffs who have devoted significant portions of their lives to the service of the City of Gastonia and the safety of its citizens. The Court's duty, however, is to faithfully apply the law to the undisputed facts. In doing so, the Court concludes that the plaintiffs have failed to state a claim for contractual impairment under the Contract Clause; provide evidence refuting the City's affidavit showing it is immune from liability for the breach of fiduciary duty claim; and even if the City is a party to the contract,  present enough evidence for a rational trier of fact to find that the City breached the contract. There is no genuine issue of material fact as to whether the City is liable to the plaintiffs for failing to fund the SPF, and judgment is appropriate as a matter of law.

**IT IS, THEREFORE, ORDERED** that:

Plaintiffs' motion for summary judgment (Doc. No. 72) is **DENIED**, and the City's motion for summary judgment (Doc. No. 95) is **GRANTED**.

**SO ORDERED**.

Signed: January 7, 2010

Robert J. Conrad, Jr.
Chief United States District Judge